**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

HALEY HRDLICKA,

     Plaintiff,

v.                                             Case No. 20-11015

GENERAL MOTORS LLC,

     Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Haley Hrdlicka brings this action against Defendant General Motors

under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*; the

Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*; the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*; Title VIII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*; and the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.* (ECF No. 20,

PageID.183.) She also brings related state law claims under Michigan law, alleging

violations of Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich.

Comp. Laws §§ 37.1101 *et seq.*, and Elliott-Larsen Civil Rights Act ("ELCRA"), Mich.

Comp. Laws §§ 37.2201, *et seq.* Plaintiff alleges that Defendant, her former employer,

interfered with her rights and discriminated against her on the basis of her disability,

age, race, and gender. (*Id.*) She also alleges that Defendant retaliated against her when

she attempted to engage in protected activity. (*Id.*)

Before the court is Defendant's Motion for Summary Judgment. (ECF No. 22.) The motion has been fully briefed (ECF Nos. 25, 26), and the court concludes that a hearing is not necessary. *See* E.D. Mich. 7.1(f)(2). For the reasons stated below, the court will grant Defendant's motion for summary judgment on all claims and enter judgment for Defendant.

## I. BACKGROUND

### A. Plaintiff's Career Path

In March 1989, Defendant hired Plaintiff as an associate sculptor in Defendant General Motors' Sculpting Department where she hand-sculpted vehicle models using clay. (ECF No. 25-2, PageID.1350.) She worked in this capacity until approximately 1998, where she then began operating a mill for clay sculpting and provided training on the machinery. (ECF No. 22, PageID.373; ECF No. 25-2, PageID.1350.) In 2004, Plaintiff returned to the company following "an extended leave," which included FMLA leave, and she began coordinating training and developing best practices for clay sculptors. (ECF No. 22, PageID.373; ECF No. 25, PageID.1211.) Although she maintains that she retained her ability to sculpt, Plaintiff had "completely moved away from sculpting and milling" by 2007. (ECF No. 25, PageID.1212; ECF No. 22, PageID.373.)

In approximately 2012, Plaintiff's role in the Sculpting Department shifted to "outreach activities," including recruiting efforts. (ECF No. 22, PageID.373.) While working in this department, she felt "happy" and "respected." (*Id.*) Moreover, in this role, she had a good relationship with her mentor, who she described as organized,

straightforward, and trustworthy. (*Id.*) She also had a great relationship with her direct supervisor. (*Id.*; ECF No. 25, PageID.1211-12.)

## B. Founding of the Design Academy

In 2017, Defendant created a new group called the Design Academy, which essentially centralized recruitment, outreach, and training functions of all of Defendant's design operations. (ECF No. 22, PageID.374.) Plaintiff's mentor informed her in May 2017 that Plaintiff would be transferred to the Design Academy, and she began transitioning into the role. (*Id.*; ECF No. 25, PageID.1212.) Plaintiff reluctantly accepted the news of her transfer, particularly because she was "disappointed" that she would not be able to return to sculpting. (ECF No. 22, PageID.374; ECF No. 22-2, PageID.440.)

Defendant assigned Marguerite Eko to lead the new, six-employee team at the Design Academy, which included Plaintiff. (ECF No. 25, PageID.1212.) Plaintiff's work environment and relationships with Eko and a coworker Kathy Englehart are at the epicenter of this dispute. Plaintiff disagreed with Eko's management style, was disgruntled with her job duties, and was frustrated with the "environment and leadership and hostility and the whole dynamic of the team." (ECF No. 22-2, PageID.440; ECF No. 22, PageID.374-75.) Plaintiff also was dissatisfied by the alleged favoritism shown by Eko to Englehart. (ECF No. 22, PageID.374-75.) Conflicts arose between Plaintiff, Eko, and Englehart; Plaintiff found Englehart to be "demeaning and hostile," testifying that their working relationship was "done" by late summer 2017 after she and Englehart had a verbal altercation. (ECF No. 22, PageID.375; ECF No. 25, PageID.1212.) These conflicts led to Plaintiff telling Eko during a meeting about the work environment, "I do not trust [Englehart], and frankly, I do not trust you, and I do not enjoy my job anymore

at all." (ECF No. 22-2, PageID.464.) In fact, on at least two occasions between late 2017 and December 2018, either Plaintiff or other coworkers in the Design Academy had raised concerns about Englehart's behavior and indicated that the team was not getting along; this spurred Eko to have a conversation with Englehart about her treatment of others and her interactions with the team. (ECF No. 24-4, PageID.947-51.)

Plaintiff alleges that the work environment fostered by Eko and Ms. Englehart's behavior towards her "had been adversely affecting her physical and behavioral health and ability to work," and although not medically diagnosed until October 2019, she maintains she exhibited symptoms of Persistent Depressive Disorder. (ECF No. 25, PageID.1213-14, 1252-53.) She was subsequently diagnosed with a brain tumor in November 2019. (ECF No. 25, PageID.1252-53.) She attributes both of her diagnoses to the work environment in the Design Academy.

Because of Plaintiff's new role, her previous sculpting-related administrative duties were given back to her former supervisors, and Defendant eliminated Plaintiff's prior position. (ECF No. 22, PageID.375; ECF No. 25-2, PageID.1361.) However, she did continue to "facilitate clay sculpting and milling global team network meetings" for another manager. (ECF No. 25-2, PageID.1353-54.)

### C. Requests for Transfer & Additional Responsibilities

In approximately August 2017, despite the elimination of her old position, Plaintiff asked Eko to be transferred back to the Sculpting Department after informing Eko she was "not happy doing this job" because it was "not what [she] signed up for." (ECF No. 22-2, PageID.440.) According to Eko, Plaintiff's request to return to the Sculpting Department was renewed "every couple weeks." (ECF No. 22-3, PageID.492.) Plaintiff

felt as though the Design Academy forced her to take on and learn new responsibilities "by fire," especially as it related to the launching of a summer intern program. (ECF No. 22-2, PageID.443.) In short, she missed the Sculpting Department, where she "was successful" and got along with all of her coworkers and supervisors. (ECF No. 22-2, PageID.463.) Plaintiff characterizes her request as one that was "open ended" and hoped to transfer back to that department "in any role for which she qualified in . . . 2018" because it was her "career path." (ECF No. 25, PageID.1213.)

Eko informed her supervisor Mark Leavy of Plaintiff's request to transfer, but Leavy informed her that Plaintiff could not return to the Sculpting Department because her position had been eliminated. (ECF No. 22, PageID.376.) Additionally, Eko informed Plaintiff that she could only leave the Design Academy if a new employee backfilled her current job. (ECF No. 22, PageID.377; ECF No. 25, PageID.1215.) In any event, the Sculpting Department indicated they did not want to accommodate a request unless it was for a new sculptor. (ECF No. 22, PageID.376-77.) According to Plaintiff, however, Eko had failed to make clear that Plaintiff would accept *any* role in which she qualified, including clay sculpting, until February 2019. (ECF No. 25, PageID.1214.) Plaintiff also contends in her affidavit that she was told on "various occasions" by a Sculpting Department manager that the manager "supported" her request "for a transfer back to Sculpting." (ECF No. 24-7, PageID.1044.)

Following the retirement of a coworker in the Design Academy in late 2018, Plaintiff's job duties expanded as she took on her coworker's community outreach duties. (ECF No. 22, PageID.377; ECF No. 25, PageID.1216.) Despite these additional responsibilities, Plaintiff received mostly positive feedback from Eko in her 2018 year-

end performance review and was noted as having "a very strong year." (ECF No. 24-15, PageID.1144-46.) She took on additional responsibilities when another coworker took leave in April 2019 and eventually retired—she was now responsible for supporting the summer internship program on top of her ordinary outreach duties. (ECF No. 22, PageID.378; ECF No. 25, PageID.1216.)

### D. Absences and Tardiness

Between May and August 2019, Plaintiff began regularly missing work or arriving later than usual; Plaintiff asserts these occurrences were the result of her "increasingly more severe physical and behavioral health related symptoms of the brain tumor and Persistent Depressive Disorder." (ECF No. 25, PageID.1216-17; ECF No. 22, PageID.378.) During this period, Plaintiff utilized sick days and vacation time as needed, or she worked remotely; however, she expressed a variety of reasons for her absences or tardiness and informed Eko "as soon as she was able to so." (ECF No. 25, PageID.1217; ECF No. 22, PageID.378.) Often, Plaintiff did not inform Eko of her intent to do so until after the fact. (ECF No. 22, PageID.378.) Text messages and communications between the parties included:

- **May 7, 2019, 8:20 AM** – Plaintiff: "I am not coming to work today. My head is really hurting. I will come and get my laptop in a bit. Thank you"
- **May 8, 2019, 8:24 AM** – Plaintiff called Eko and indicated she was still not feeling well and asked a friend to pick up her computer.
- **May 17, 2019, 8:07 AM** –  Plaintiff: "Hi Maggie. I am taking a vacation day today. Ashley[1] had a high temperature and a bad cough so I am taking her to the doctors . . . ."
- **May 24, 2019, 8:27 AM** – Plaintiff: "Hello, A family situation has come up. I will call you in a few. I will have to take a vacation day to deal with it. Thank you"

---

[1]     Ashley is Plaintiff's daughter.

- **May 31, 2019, 8:25 AM** – Plaintiff: "Hello Maggie. Would it be possible for you to run my laptop out to me at the south lobby at 9? If it is ok with you I would like to work from home today."
- **June 6, 2019, 8:35 AM** – Plaintiff: "Hi Maggie, I am running late this morning. I'll be in short[l]y"—Plaintiff arrived at nearly 11 AM.
- **June 7, 2019, 8:50 AM** – Plaintiff: "I am trying to see if I can get into the dr today. I am just so tired. I am going to work from home if that is ok. Hopefully something is off that a blood test can solve…iron or something."
- **June 11, 2019, 8:36 AM** – Plaintiff informed Eko she is running late.
- **June 12, 2019, 7:37 AM** – Plaintiff: "Hello Maggie… I am taking a vacation day today. Thank you."
- **June 18, 2019, 8:08 AM** – Plaintiff: "I will be late this morning. One of Ashley's friends stayed the night last night and long story short I need to stay here until her mom comes to get her. I'll explain later."—she arrived at 11:00 AM.
- **June 25, 2019, 8:21 AM** – Plaintiff: "Good morning…I'm at the doctors with Ashley. She is getting a breathing treatment and then I will be in."
- **July 16, 2019, 9:20 AM** – Plaintiff informed Eko she had a flat tire and would work from home; she appeared on a meeting that morning but "lost contact" and was not seen working online until 1:30 PM.
- **July 24, 2019, 9:03 AM** – Plaintiff: "Hello Maggie…I am home today. I have a fever and other symptoms. I will call in for your intern planning meeting."
- **July 26, 2019, 9:04 AM** – Plaintiff: "I'm coming in. I am just having a tough time this morning. Please do not share that with anyone please…"
- **July 31, 2019, 9:30 AM** – Plaintiff: "I will not make your 10 meeting. I am not feeling well . . . But I will be online later, I'm in bed."
- **August 2, 2019, 9:58 AM** – Plaintiff: "Hello. I have been with my dad this morning. He was having some issues. I will be in shortly."
- **August 7, 2019, 9:28 AM** – Plaintiff: "Hi. I am getting Ashley's hands wrapped before she goes to nannying."
- **August 8, 2019, 10:32 AM** – Plaintiff: "Hi Maggie….I'm struggling this morning and [I] am [not] sure if I make it in" "It's more of a mental thing…please do not share" "Thank you. The certificates are on my desk. Black folders.
- **August 9, 2019, 10:13 AM** – Plaintiff: "Hi . . . I will not be in today"
- **August 13, 2019, 12:06 PM** – Plaintiff: "Hello Maggie I will not be in today. I'm out sick and will review items from home. Thank you."

(ECF No. 25, PageID.1219-22; ECF No. 22, PageID.378-80.)

Beginning in June 2019, Plaintiff arrived to work after 9:00 AM on most days,

even though she generally arrived to work by that time for the first half of the year. (ECF

No. 22-7, PageID.583-90.) On June 10, 2019, Eko and Plaintiff met one-on-one because Eko indicated she was "concerned" about Plaintiff's tardiness; Eko "communicated the need to work a 40 [hour] work week," "the need to text if she was planning on taking a day off," and the "need to get 'work from home' approved in advance if she planned on working from home." (ECF No. 22-8, PageID.594.) Plaintiff acknowledges that this conversation occurred and that Eko addressed "attendance issues and/or tardiness issues. She does not, however, characterize the conversation as a "warning." (ECF No. 25, PageID.1227; ECF No. 25-2, PageID.1384.) With the help of Christie Spadine, one of Defendant's human resources employees, Eko incorporated her concerns into Plaintiff's 2019 mid-year performance review, expressing that a "significant and contributing factor to [Plaintiff's] decreased performance has been her attendance," and that Plaintiff was not "completing her own role," particularly since her duties shifted in approximately March 2019. (ECF No. 24-17, PageID.1160-61; ECF No. 25, PageID.1228.) Her performance review report then clarified that she was "expected to plan vacation in advance and seek approval prior to tak[ing] a vacation day," and that the "expectation" was for Plaintiff to put in a minimum of forty hours per week. (ECF No. 24-17, PageID.1161.) Neither Eko nor Spadine made an in-depth inquiry into Plaintiff's various proffered reasons for missing work. (ECF No. 25, PageID.1228.)

Early August 2019 was a "critical" time for Plaintiff's role because she was responsible for overseeing Defendant's summer internship program; the program ended the week of August 5, which "culminated in formal presentations of their summer's work, which impacted whether they would receive a job offer from [Defendant]." (ECF No. 22, PageID.382.) However, on the day of the presentation "dry-runs," August 7, Plaintiff did

not arrive to work until after 1:00 PM, informing Eko via text message that there was an issue with her daughter's hand. (ECF No. 22-10, PageID.602; ECF No. 22-6, PageID.572-73.) According to Plaintiff now, the "real reason" for her absence was her deteriorating physical and behavioral health—although Plaintiff did not inform Eko of this fact. (ECF No. 25, PageID.1229.) Additionally, Plaintiff was absent for "the actual [intern] presentations the next day," as well as the day following, "which was the interns' last day and the day of an Open House where their presentations were on display." (ECF No. 22, PageID.382.) She did not inform anyone of her absence until after 10:00 AM on these days. (*Id.*) While Plaintiff concedes her absences and that attendance on these days was of particular importance, she maintains she "had been disabled from attending the presentations on both days because of her deteriorating physical and behavioral health" and gave notice of her inability to attend as soon as she could. (ECF No. 25, PageID.1229-30.)

### E. Plaintiff's Attendance Letter and Termination

On August 14, 2019, Plaintiff met with Eko and Anne Banks, a human resources employee, and Plaintiff was given an attendance letter. (ECF No. 22, PageID.383.) The letter specifically addressed Plaintiff's "continued pattern of erratic work schedules and extended break periods," which created a "disruption to the team." (ECF No. 22-13, PageID.615.) The letter, which was signed by Eko, made clear that Plaintiff was required to abide by particular attendance and reporting requirements, and it warned her that "*failure to abide by these requirements may result in [her] separation from General Motors.*" (ECF No. 22, PageID.383; ECF No. 22-13, PageID.615.) Specifically, the letter explained:

1. Work hours
Your work hours are 8:00am – 4:30pm, with 30-minute lunch break. You are expected to be in the office, at your desk, each morning at your start time. If you have meetings outside that schedule, you are expected to be on time and present to such meetings and may flex your schedule accordingly. You must notify me via text or phone as soon as practicable if your schedule will deviate from the agreed upon work hours for these meetings

2. Reporting Absences
You must notify me to report any absences. You must notify me no later than 7:00am on the day of absence, via text message. I will respond to your text message immediately and follow up with a phone call if further discussion is needed. You must contact me daily for each absence. If you are unable to reach me, you must then notify Kristie Spadine.

(ECF No. 22-13, PageID.615.) The letter also provided a process for absences due to

personal illnesses, which required a "note secured on the doctor's official letterhead

specifically documenting" dates of treatment; a prognosis; and a signed statement from

a doctor as to whether Plaintiff would be able to work and, if not, how many absences

would be required. (*Id.*) The letter informed Plaintiff that the requirements for absences

due to personal illnesses were not applicable "when an appropriate health care provider

certifies your eligibility for S&A benefits or provides satisfactory certification of need for

a qualifying unpaid Family and Medical Act leave." Additionally, the letter explained that

Plaintiff was not authorized to work from home without "pre-approval from leadership."

(*Id.*) Finally, the letter concluded with an express warning and an avenue of receiving an

accommodation if she needed it:

We want to draw your attention to the seriousness of the current situation and the necessary steps required to improve your attendance. Your attendance must improve immediately. Your job is in jeopardy. We expect that you will take all necessary steps to remedy the situation. Failure to comply with these expectations can result in disciplinary action, up to and including discharge from General Motors. Please contact Human Resources if you believe you may require an accommodation to help you perform your job duties.

(*Id.*, PageID.616.) Eko read the letter aloud to Plaintiff at their meeting. (ECF No. 22, PageID.384.) Banks recalls communicating the availability of Defendant's Employee Assistance Program ("EAP") at this time, although Plaintiff does not specifically "recall . . . additional commentary" from either Eko or Banks that day. (ECF No. 24-7, PageID.104; ECF No. 25-2, PageID.1376; ECF No. 22-12, PageID.610-11.) Plaintiff acknowledges that they "may have" mentioned EAP but states did not know what it was. (ECF No. 22-2, PageID.462.) In any event, Plaintiff did not inquire into FMLA or S&A benefits that were noted in the attendance letter, nor did she inquire into Defendant's comprehensive "People Services," which were noted in the e-mail that provided her a copy of the letter the same day. (ECF No. 25, PageID.1236; ECF No. 22-2, PageID.457-59; ECF No. 22-14, PageID.618.) Moreover, Plaintiff did not utilize Defendant's intranet portal, *Socrates*, which provided access to information regarding the confidential EAP, leave of absences, and other accommodations. (ECF No. 22, PageID.388-89.) And although she did not receive training as to Defendant's "procedures, eligibility and other criteria applicable to EAP, FMLA, S&A, ADA, and work-related accommodation for disabilities" (ECF No. 25, PageID.124), she had previously taken "a combination of maternity leave and FMLA-leave in connection with the birth of her two children." (ECF No. 22-2, PageID.438.)

Despite the attendance letter requiring her to arrive by 8:00 AM, Plaintiff was tardy the next two workdays. (ECF No. 22-7, PageID.590.) And although she logged more than eight hours of work, she did not report either of her late arrivals to Eko. (ECF No. 22, PageID.386; ECF No. 25, PageID.1239.) One of these instances occurred on Monday, August 19—Plaintiff was thirty-two minutes late, and she later explained was

that she was on a phone call with her father and did not want to end it. (*Id.*; ECF No. 22, PageID.386; ECF No. 25, PageID.1239.)

On the same day, Plaintiff met with Banks and Spadine to discuss her "mental disposition and the dynamics of the team . . . and how that was contributing to what was going on." (ECF No. 22-2, PageID.447; ECF No. 25, PageID.1239.) Plaintiff contends that she used this opportunity to inform the human resources department—for the first time—about the work environment under Eko and her coworker Englehart's behavior, although other coworkers had previously made similar complaints to human resources employees. (ECF No. 22-2, PageID.448; ECF No. 22, PageID.386.) Plaintiff also renewed her request to return to the Sculpting Department, which Plaintiff admits was the only "accommodation" she had sought at the time. (ECF No. 22, PageID.387; ECF No. 25, PageID.1243; ECF No. 25-2, PageID.1376.) Both Banks and Spadine deny that Plaintiff mentioned depression or any medical condition at this meeting, while Plaintiff asserts she informed them she had been experiencing depression since her transfer to the Design Academy. (ECF No. 22, PageID.387; ECF No. 25, PageID.1242-43.)

The next day, on August 20, Plaintiff was once again late due to "traffic." (ECF No. 22, PageID.388; ECF No. 25, PageID.1244.) On August 21, given that she was tardy each day since receiving her attendance letter, which expressly required her to be "in the office, at [her] desk, each morning" by 8:00 AM, Plaintiff's employment was terminated. (ECF No. 22, PageID.388; ECF No. 25, PageID.1244.) Eko met with Plaintiff and ultimately made the decision to terminate her, although Eko had consulted with Sharon Gauci—an executive director responsible for Defendant's industrial design—before meeting with Plaintiff, and Eko also received a general list of talking

points from Spadine that the department used to assist leaders in the process of firing

an employee. (ECF No. 22-4, PageID.512; ECF No. 22-3, PageID.498; ECF No. 24-10,

PageID.1061.)

**F. Post-Termination**

Under Defendant's "Open Door Policy," Defendant provides all salaried

employees an opportunity to seek review of employment decisions through a third-party

company, JustUs. (ECF No. 22, PageID.390; ECF No. 25, PageID.1249.) The review is

limited—JustUs determines whether Defendant "followed their policies and practices" in

terminating an employee, although the "final determination is up to [General Motors]."

(ECF No. 22-21, PageID.674; ECF No. 24-6, PageID.998; ECF No. 22-20,

PageID.666.) According to a representative of JustUs, while it is not impossible for an

individual to be reinstated after termination, the company's review is limited to only "the

facts of the day that the decision is made and the action is taken." (ECF No. 22-20,

PageID.667.)

Plaintiff submitted an Open Door review to JustUs on August 27, 2019. During

the course of the Open Door appeal in October and November, Plaintiff was diagnosed

with a brain tumor; it was surgically removed on November 15, 2019. (ECF No. 22,

PageID.390; ECF No. 25, PageID.1250.) She was also medically diagnosed with

Persistent Depressive Disorder on October 8, 2019. (ECF No. 25, PageID.1253.)

Plaintiff provides her own affidavit that indicates her doctor "opined that the brain tumor

was the cause or contributing cause of the severe depression diagnosed . . .  as

Persistent Depressive Disorder that Plaintiff had experienced during at least the last 18

months of her General Motors employment," and these symptoms had an effect on

"Plaintiff's ability to care for herself, perform manual tasks, eat, sleep, concentrate, think and make decisions, communicate, interact with others, and work." (ECF No. 24-7, PageID.1041; ECF No. 25, PageID.1252-53.)

JustUs concluded that Plaintiff's termination was consistent with Defendant's policies based on the information Eko had when Plaintiff was fired. (ECF No. 22-23, PageID.682.) On November 25, 2019, Plaintiff was advised that her Open Door appeal had been denied. (*Id.*; ECF No. 25, PageID.1250.)

## II. STANDARD

To prevail on a motion for summary judgment, a movant must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presenting evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Not all factual disputes are material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim "and would affect the application of the governing law to the rights of the parties." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013). There is no requirement that the moving party "support its motion with [evidence] negating the opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This

requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility' of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

For a court to deny summary judgment, "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

### III. DISCUSSION

Plaintiff's ten-count complaint alleges violations of various federal and Michigan statutes: the FMLA, ERISA, ADA, PWDCRA, ADEA, Title VII, ELCRA, and Defendant has moved for summary judgment on all claims.

### A. FMLA Claims (Count I)

Defendant contends that it is entitled to summary judgment because Plaintiff cannot establish any FMLA violation. Plaintiff argues there are genuine issues of material fact remaining, specifically where "Defendant's representatives . . . wrongfully denied her transfer request; issued the [attendance] letter to file to her; terminated her employment on August 21, 2019; and denied her . . . appeal." (ECF No. 25, PageID.1303.) The crux of Plaintiff's claims is that Defendant violated the FMLA by failing to abide by an obligation to inquire into whether Plaintiff would qualify for FMLA leave and inform her of that right, and by terminating her.

In the Sixth Circuit, plaintiffs may bring a private cause of action and have two "theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 555 (6th Cir. 2006) (internal quotation omitted). Plaintiff has alleged both an interference and a retaliation claim under the FMLA. (ECF No. 20, PageID.245–50.)

Under the interference theory, it is unlawful under 29 U.S.C. § 2615(a) "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" FMLA leave rights. To prove an FMLA interference claim, a plaintiff must show that "(1) she was an eligible employee; (2) the defendant is an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled." *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (quoting *Killian*, 454 F.3d at 556).

The retaliation theory focuses on "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (internal quotations omitted). To prevail, Plaintiff must first "[make] a *prima facie* case for FMLA retaliation." *Marshall v. The Rawlings Co.*, 854 F.3d 368, 381 (6th Cir. 2017). Specifically, Plaintiff must show that she "[1] availed herself of a protected right under the FMLA; [2] her employer knew she availed herself of her right under the FMLA; [3] she suffered an adverse employment action; and [4] there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action." *Id.*

(citations removed); *Seeger*, 681 F.3d at 283. "The burden of proof at the *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger*, 681 F.3d at 283 (quoting *Dixon v. Gonzales*, 381 F.3d 324, 333 (6th Cir. 2007)).

"The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506 (6th Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)); 29 U.S.C. § 2612(a)(1). The FMLA defines a "serious health condition" as "an illness . . .  that involves" either "inpatient care in a hospital" or "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). Federal regulations also define what constitutes "continuing treatment by a health care provider." *See* 29 C.F.R. § 825.115. This includes a "chronic serious health condition," defined as one which:

> (1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;
> (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and
> (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(c). Defendant argues that Plaintiff cannot establish that she was covered under the FMLA because there is no evidence that her mental condition constituted a "serious health condition" as defined under the pertinent regulations. (ECF No. 22, PageID.392.) Plaintiff does not provide actual analysis on this issue in response to Defendant, but by quoting the regulation, she seems to contend that she had a

"chronic condition." (ECF No. 25, PageID.1301.) The court agrees with Defendant, and the interference and retaliation claims must fail. While it is possible that Plaintiff's ailment could rise to a "chronic serious health condition," in response to Defendant's arguments, Plaintiff fails to direct the court to specific evidence demonstrating such a condition. *Watkins v. Blind & Vision Rehab. Servs. of Pittsburgh*, No. 2:16CV01850, 2018 WL 4491162, at *5 (W.D. Pa. Sept. 19, 2018) (acknowledging that the plaintiff's condition could be found to be a chronic condition but failed to adduce sufficient evidence to prove it).

While an employer who lacks "sufficient information about the reason for an employee's use of leave . . . should inquire further of the employee . . . to ascertain whether leave is potentially FMLA–qualifying," 29 C.F.R. § 825.301, sufficient notice must be given "to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Barrett v. Detroit Heading, LLC*, 311 F. App'x 779, 791 (6th Cir. 2009) (quoting *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir.2004)).

The thrust of Plaintiff's argument is that Eko should have known to inquire into Plaintiff's behavioral health problems—namely, Plaintiff's depression—because Plaintiff was taking sick days or vacation time for various reasons. But as a preliminary matter, Plaintiff's claim falls short because she provides no evidence as to whether her depression constituted a "chronic serious health condition" under § 825.115(c). "Proper notice is ultimately irrelevant if [Plaintiff] cannot demonstrate that he sought leave for a legitimate reason under the FMLA*." Stimpson v. United Parcel Serv.*, 351 F. App'x 42, 48 (6th Cir. 2009).

While Plaintiff provides ample testimony in her deposition and an affidavit regarding how she was "debilitated by depression," or otherwise had trouble thinking, making decisions, concentrating, sleeping, and being productive and effective at work, she fails to point to evidence that could convince a factfinder that her diagnosis required (or that she even engaged in) periodic visits—defined as twice a year—for treatment by a health care provider. (ECF No. 25-2, PageID.1346; ECF No. 24-7, PageID.1042.) Indeed, although Plaintiff claims she suffered from depression for the eighteen months leading to her termination, she admitted in her deposition that she did not seek treatment for her symptoms at any time during this period. (ECF No. 22-2, PageID.425-26.) She never saw, let alone *sought*, any medical professionals for over *eighteen months*. (ECF No. 22-2, PageID.425-26.) Rather, her first documented visit to any medical professional was October 8, 2019—nearly two months after she was given the attendance letter and six weeks after her termination.[2] (ECF No. 24-7, PageID.1041-42; ECF No. 22-2, PageID.425-26.) This extended time period leaves open the question of what treatment, if any, would be necessary.

---

[2]     Plaintiff's alternative arguments under the FMLA that she was entitled to reinstatement after her appeal have no merit. JustUs limited its review to what Defendant knew at the time of any adverse employment action. Plaintiff was terminated on August 21, 2019—she was no longer an employee, and she directs the court to no authority that would require Defendant to reinstate her under the circumstances before the court. At the time she was terminated, she was no longer an "eligible employee" under the FMLA. *See Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) ("Brohm was not an 'eligible employee' at the time he received medical attention for his condition. He had already been terminated a week earlier."); *cf. Miles v. Nashville Elec. Serv.*, 525 F. App'x 382, 388 (6th Cir. 2013) (citing *Brohm*, 140 F.3d at 523) (finding that, even assuming an employer had a policy to reinstate a resigned employee, "any duty [an employer] has to follow that policy does not arise under the FMLA").

Even after her termination, the record is particularly wanting as to admissible evidence indicating what treatment, if any, was actually required in connection with Plaintiff's particular diagnosis. Plaintiff, in an affidavit, states merely "I was diagnosed with Persistent Depressive Disorder by Lori Kanat Edelson LMSW, ASCW, BCD on October 8, 2019." (ECF No. 24-7, PageID.1041.) Her deposition testimony is scarce— when asked how long she "counseled" with Edelson, she stated only that it occurred from "approximately" from mid-October to early March 2020. (ECF No. 22-2, PageID.425.) But there is no indication in the record that on the days she was absent or tardy, the very days that led to her dismissal, were the result of a "serious health condition" that required some sort of specific "treatment" as defined by the FMLA. *See, e.g.*, *Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 500 (7th Cir. 1999) (holding there was no serious health condition where there was a "dearth of evidence" as to the necessity of treatments such as affidavits from medical personnel); *Culpepper v. BlueCross BlueShield of Tennessee, Inc.*, 321 F. App'x 491, 497 (6th Cir. 2009) (finding insufficient evidence of "serious health condition" to withstand summary judgment where the plaintiff relied on his own testimony and "produced no evidence that the five unexcused absences that caused her dismissal were covered by the FMLA").

An employee has an obligation to "show a serious health condition," and abundant case law establishes that "general testimony that a condition is serious is insufficient to raise a genuine issue of material fact on this issue." *Glander v. NGK Spark Plugs, Inc.,* No. 11-CV-14372, 2012 WL 5828620, at *6 (E.D. Mich. Oct. 25, 2012) (collecting cases); *McDonnell v. Overhead Door Co*., No. 4:20-CV-00242, 2022 WL 402684, at *4 (M.D. Pa. Feb. 9, 2022) (finding no chronic serious health condition

where the plaintiff had "not adduced evidence that he visited a health care provider twice a year to treat his anxiety and depression"); *cf. Brohm*, 149 F.3d at 523 (6th Cir. 1998) (deeming treatment received after termination to be "irrelevant" because the plaintiff was not an "eligible employee," and there was "no evidence that he requested medical leave while he was employed by the hospital"). Here, there is no admissible evidence of any specific plan or treatment in connection with her depression, and Plaintiff's FMLA claims must fail. *See, e.g.*, *Scobey v. Nucor Steel–Arkansas*, No. 06–CV–0078, 2008 WL 110849, at *6 n.6 (E.D. Ark. Jan.7, 2008) ("Plaintiff certainly has not demonstrated that his depression constituted a chronic condition as there is no evidence in the record that plaintiff ever sought or received treatment for depression following his three sessions of outpatient care in May 2005. Plaintiff's depression simply was not a condition that required periodic visits for treatment by a health care provider and continued over an extended period of time."); *DiSantis v. Morgan Properties Payroll Servs., Inc.*, No. CIV.A. 09-6153, 2010 WL 3606267, at *11 (E.D. Pa. Sept. 16, 2010) ("There is no record evidence, such as medical documentation, expert testimony, or affidavits, that indicates that her purported mental issues necessitated the requisite continuing treatment to qualify as serious health conditions under the FMLA."). Here, Plaintiff provides only her own affidavit that a neurosurgeon relayed to her that "a brain tumor grows slowly and becomes increasingly more severe over time, causes depression and other adverse physical and behavioral health conditions that become increasingly more severe over time." This does little to explain whether her depression was a serious health condition. (ECF No. 24-7, PageID.1041.) There is no ostensibly

admissible evidence in the record from a medical professional as to what Plaintiff's particular diagnosis of depression required.

Furthermore, even if her depression constituted a serious health condition as defined under the FMLA, there was insufficient notice that she sought FMLA-qualifying leave, dooming both her interference and retaliation claims.[3] When an employee seeks to utilize FMLA leave for a qualifying condition, "the eligible employee, during his employment, must request leave and give the employer notice that he is requesting leave for a serious health condition that renders him unable to perform his position's duties." *Brenneman*, 366 F.3d at 421. "When the need for leave is 'not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case.'" *Koch v. Thames Healthcare Grp., LLC*, 855 F. App'x 254, 257 (6th Cir. 2021) (quoting 29 C.F.R. § 825.303(a)). Moreover, an employee must continue to comply with "the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.303(c). While an employee "giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice," the employee still must "state a qualifying reason for the needed leave and otherwise satisfy the notice requirements set forth in . . . § 825.303." 29 C.F.R. § 825.301(b); *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005). "The critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the

---

[3]     Insofar as she relies on the diagnosis of her brain tumor to advance her FMLA claim, the analysis of notice is the same.

employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Koch*, 855 F. App'x at 256 (quoting *Brenneman* 366 F.3d at 421).

"Whether an employee's notice is sufficient to apprise the employer of the need for FMLA leave is a mixed question of fact and law." *Shelton v. Price Waterhouse Coopers, LLP*, No. 8:12-CV-02757-T-27, 2014 WL 2581350, at *1 (M.D. Fla. May 23, 2014) (citing *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001)). "Although it is within the province of the jury to determine the facts of the notice given, it is for the court to determine whether those facts are sufficient reasonably to give an employer notice as required by the FMLA." *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 723 (6th Cir. 2003). "Therefore, for summary judgment purposes, [the court] should determine whether, viewing the facts in the light most favorable to [Plaintiff], [Plaintiff] has complied with the FMLA's notice requirements as a matter of law. *Id.*

Plaintiff argues that Defendant was on notice that she was suffering from a serious health condition necessitating FMLA leave because her interactions with Eko made it clear she was suffering from depression; she relies heavily on her text conversations with her.[4] (ECF No. 25, PageID.1304.) However, a review of the record shows a variety of excuses for Plaintiff's failure to arrive to work on time or appear at all.

---

[4]     Plaintiff also notes in her response that her "unusual and excessive weight gain" between May and August 2019 evince notice that she suffered from a serious health condition. (ECF No. 25, PageID.1304.) While excessive weight gain in a period of only three or four months could raise awareness as to a health condition, the record conflicts with this assertion. In Plaintiff's deposition she mentions that she gained forty pounds not over the course of three months, but over the course of over *two years* from May 2017 until her August 2019 termination. (ECF No. 22-2, PageID.428.)

For example, Plaintiff proffered a wide range of generalized "sick" absences for missing

work. Among those reasons were that her head was "really hurting," she was "not

feeling well," she was "just so tired," she had a "fever and other symptoms," she was

"having a tough time," and she was "out sick." (*See* ECF No. 22-6.) But the federal

regulations governing notice make it clear that merely "[c]alling in 'sick'" without

providing more information will not be considered sufficient notice to trigger an

employer's obligations under the Act." 29 C.F.R. § 825.303. Similarly, the common cold,

the flu, and an upset stomach are not "serious health conditions." 29 C.F.R. § 825.113.

Plaintiff's complaints are largely akin to these generalized descriptions of ailments, and

Sixth Circuit case law supports the principle that an employee must use more specific

language to properly give notice. *See, e.g.*, *Beaver v. RGIS Inventory Specialists, Inc.*,

144 F. App'x 452, 456-57 (6th Cir. 2005) (finding no notice of FMLA-qualifying ailment in

part because due to plaintiff's general descriptions of her ailment and absence such as

"didn't feel good," "sick," "needed a couple of days to get better, a few days," and where

there was no indication "she could not work due to illness"); *Walton*, 424 F.3d at 486-88

(holding insufficient notice where plaintiff informed employer he had "twisted his knee,"

intermittently returned to work, failed to submit any medical documentation until "nearly

two weeks after he was terminated," and indicated he was taking "sick day[s]"); *see also*

*O'Connor v. Busch's Inc.*, No. 07-11090, 2008 WL 3913688, at *7 (E.D. Mich. Aug. 19,

2008) (holding plaintiff's requests for time off to see a doctor not rise to sufficient notice

where there was no indication she suffered from a medical condition that impaired her

ability to perform her job); *Booth v. Roadway Express, Inc.*, No. 03-660, 2005 WL

1705064, at *8 (S.D. Ohio May 11, 2005) ("There are countless reasons a person may

see a doctor, and not every visit to the doctor implies a person suffers from a serious medical condition which may qualify for FMLA leave."). Often, Plaintiff informed Eko she was not coming in for purported reasons unrelated to any of her own health conditions, including taking her daughter to the doctor or citing "a family situation" without any further information. (ECF No. 22-6, PageID.534-35.) Sometimes, no reason was given whatsoever. Rather, Plaintiff would simply inform Eko she was taking a sick day or ask to work from home.[5] To the extent she argues that these various sick days should have been designated as FMLA leave, the information she provided Plaintiff was simply too vague to justify FMLA relief. *See* 29 C.F.R. § 825.303; *Patterson v. Goodyear Tire & Rubber Co.*, No. 08-2060-EFM, 2011 WL 1484153, at *10 (D. Kan. Apr. 19, 2011) ("[T]he employer still needs to be on notice that the employee might qualify for FMLA benefits.")

The court also finds significant that at no point did she approach any of her supervisors to request any type of leave for a purpose other than what she stated she needed: for example, when she was "sick," she was given the day off or approved to work from home *because she was "sick." Cf. Atanasovski v. Epic Equip. & Eng'g, Inc.*, No. 19-CV-11518, 2021 WL 1253298, at *11 (E.D. Mich. Apr. 5, 2021) (finding the plaintiff's notice was insufficient where he presented no evidence that "he ever

---

[5]     The fact that Plaintiff often ended up working from home cuts against her ability to show that she actually requested FMLA-qualifying leave due to *being unable to work*. *Cf. Anderson v. McIntosh Const., LLC*, 597 F. App'x 313, 314 (6th Cir. 2015) ("Anderson offers no evidence that she requested leave at all, much less that she told McIntosh she needed leave because of a medical condition. At most, Anderson has shown that she requested permission to work from home, away from [an employee who caused her stress]. But working from home is still working; so that request was not a request for leave under the FMLA.").

requested or indicated a desire for additional medical leave beyond the time off he received to attend medical appointments or for his hospitalizations in the past, which was always permitted," and where he merely informed his employer he "had some upcoming doctor appointments," required hospitalization after a "procedure," and was cleared for work by a physician). Nothing in the record would give notice to Defendant that she was requesting FMLA leave for a medical condition because her various proffered reasons had nothing to do with depression. Plaintiff's admittedly "casual" conversations about "mental troubles" with Eko that were rooted in her "displeasure with working in the group" cannot be seen as notice of a *serious medical condition*. (ECF No. 25-2, PageID.1378.)

To be sure, Plaintiff directs the court to one message that at least *somewhat* relates to the symptoms she was experiencing. (ECF No. 22-6, PageID.558.) But that relation is minimal, especially when considered in the context of her other wide-ranging excuses given to Eko. Plaintiff sent a text to Eko stating, "I'm struggling this morning and [I] am [not] sure if I will make it in." (ECF No. 22-6, PageID.576.) When Eko asked if she was sick, Plaintiff responded, "Correct . . . it's more of a mental thing . . . please do not share." (*Id.*) Plaintiff then unilaterally transitioned the conversation on to business matters. (*Id.*; ECF No. 22-3, PageID.500.) If Plaintiff had a known history of depression or psychological illnesses, one might speculate that this "more of a mental thing" comment could have been sufficient—but she had no such history. When considered as a whole, the record demonstrates that Plaintiff did not reasonably apprise Eko that Plaintiff's sporadic use of sick or vacation time was due to an FMLA-qualifying reason or that she needed leave. Eko's ultimate decision to terminate Plaintiff came after she

failed once again to abide by the terms of her attendance letter, citing only "traffic" as the reason for her tardiness, without any connection to a serious health condition.

Plaintiff concedes that the first time Plaintiff ever used the word "depressed" or "depression" was in her telephone meeting days before her termination with Banks and Spadine on August 19, 2019—although whether Plaintiff ever used such a word is disputed by both Banks and Spadine. (ECF No. 22, PageID.387; ECF No. 25, PageID.1242-43.) Even assuming, as the court must, that Plaintiff made such a statement, this meeting was also the only time in the eighteen months during which she allegedly struggled in the Design Academy where she made any complaint to Defendant's human resources department about her coworkers. (ECF No. 22-2, PageID.448; ECF No. 22, PageID.386.) While courts have found that "[i]nterference with an employee's rights includes an employer's failure to advise the employee of her rights under the FMLA*," Lytle v. Magnolia Vill. Ret. Cmty.*, Ltd., No. 1:08 CV 1359, 2009 WL 1616397, at *5 (N.D. Ohio June 3, 2009) (citing *Cononshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 142-43 (3d Cir. 2004)), Plaintiff has failed to establish a viable interference claim under this alternative theory.

First, the parties agree that Plaintiff's discussion with Banks and Spadine was not accompanied by a request for leave or any time off. *Cf. Anderson*, 597 F. App'x 313 at 314-15 ("[T]he FMLA did not require McIntosh to provide leave, because Anderson never requested it."). Nor is there any request by Plaintiff for Defendant to designate her sick days or vacation days as FMLA leave. Despite telling Banks and Spadine that she was "trying to find help," Plaintiff admits her *only* request to remedy the situation was to "switch [her] out of the department" and return to the Sculpting Department. (ECF No.

25-2, PageID.1376.) When viewing the circumstances of the conversation as a whole, Plaintiff's deposition evinces that the nature of the conversation on August 19 was in large part to inform Banks and Spadine she did not get along with her coworkers and wanted to return to the Sculpting Department. Significantly, in her deposition, she affirms that, during the August 19 meeting,

> I attempted to explain the *reasons for my recent tardiness* and how it was all *related to my current work environment created by my group manager*. Details of my reasoning include a lack of leadership, direction, a lack of trust within the group, favoritism taking place, a lack of credit given to the appropriate individuals, crossed lines of responsibility within the group, and a culture within the department which made an untenable work environment.

(ECF No. 25-2, PageID.1374-75 (emphasis added).) Thus, Plaintiff's "reasons for her recent tardiness" would not give notice that she sought FMLA leave, but instead that Plaintiff's difficulty doing her job related to her poor relationship with Eko. And Banks' declaration corroborates the overarching atmosphere of the conversation, as she notes:

> Ms. Hrdlicka informed us that she was struggling in the Design Academy because she did not like one of her co-workers, Kathy Englehart, and did not think her leader, Ms. Eko, was handling the situation effectively . . . Ms. Hrdlicka reiterated that she did not like working with Ms. Englehart or Ms. Eko and that she would like to be transferred back to Sculpting.

(ECF No. 22-12, PageID.611.)

Second even assuming *arguendo* that Plaintiff's depression constituted a serious health condition *and* that she informed Banks and Spadine of her depression, the "record makes clear . . ., [P]laintiff, over the course of [her] employment, received several informational notices from [D]efendant" regarding the general availability of FMLA leave, showing only her "own willful ignorance," not any "culpability on [D]efendant's part" as the source of her failure to request FMLA leave. *Brenneman*, 366

F.3d at 425. Indeed, the FMLA "does not require [D]efendant to foresee that [P]laintiff would not have read the many notices that it had sent regarding the FMLA's coverage and, thus, either to force [P]laintiff to read those notices or to convey their content to [her] verbally." *Id.* Plaintiff, a long-term employee of Defendant, was familiar with Defendant's intranet, *Socrates*, the homepage of which gave her immediate access to Defendant's policies and benefits which address medical leave. (ECF No. 22-16, PageID.626-29.) But more importantly, the attendance letter specifically addressed to Plaintiff informed her that she would not need to notify Defendant of any absences "*when an appropriate health care provider certifies your eligibility for S&A benefits or provides satisfactory certification of need for a qualifying unpaid Family and Medical Act leave.*" (ECF No. 22-13, PageID.615.) And notably, Plaintiff concedes that the letter was *read aloud* to her, and she *signed* the letter. (ECF No. 24-7, PageID.1048.) It is also undisputed that Plaintiff never sought out such certification as requested, nor did she inform anyone of her need to do so when Eko gave her the letter and read the contents to her.[6] Finally, Plaintiff had previously taken "a combination of maternity leave and FMLA [] leave in connection with the birth of her two children," evincing that she had the ability to properly seek out FMLA at some point during the eighteen months she endured her depression. (ECF No. 22-2, PageID.438.)

---

[6] At no point did Plaintiff seek out a certification form or inquire about one, implicating the FMLA's requirement that an employee seeking leave must still abide by "the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.303(c). To this end, Plaintiff provides the court with Defendant's FMLA policy that explicitly requires Plaintiff, "*in order to qualify for FMLA-protected leave*," to contact Defendant's administrator of FMLA claims, Sedgwick. (ECF No. 24-11, PageID.1105.)

Third, to the extent Plaintiff relies on the diagnosis of her brain tumor as her serious health condition to support her claims, her efforts are in vain—she cannot be said to have given notice to Defendant of this condition. Indeed, even Plaintiff was unaware she suffered from an ailment of such a nature until approximately two months after her termination, and nothing she told any of Defendant's agents came close to apprising them of such an illness. Courts have recognized that an employee "should not be encouraged to mousetrap their employers" by purporting to request FMLA leave "on patently insufficient grounds and then after leave is denied obtaining a doctor's note that indicates that sufficient grounds existed, though they were never communicated to the employer." *See, e.g.*, *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1385 (11th Cir. 2005) (quoting *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 952 (7th Cir. 2004)). An employee must "give the employer a reason to believe that he is entitled to it." *Id.*  For instance, "[i]f you have brain cancer but just tell your employer that you have a headache, you have not given the notice that the FMLA requires." *Id.*

Finally, although not addressed by the parties, a burden-shifting analysis applies under the FMLA, and it is particularly relevant as to Plaintiff's retaliation claim. *See Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008). The Sixth Circuit has found that "[a]n employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003); *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012). Given the clear evidence that Plaintiff repeatedly ignored Eko's orders regarding attendance and work hours, it is clear that by the time Plaintiff informed Banks

and Spadine that she was depressed, "the 'wheels of termination' had already been put into motion." *Gipson v. Vought Aircraft Indus.*, Inc., 387 F. App'x 548, 557 (6th Cir. 2010). Plaintiff cannot establish pretext for her retaliation claim.

To summarize, Plaintiff provides no evidence that her depression for which she sought leave constituted a serious health condition as defined by the FMLA and its pertinent regulations. Nor can she establish there was sufficient notice to Defendant that she was either seeking or eligible for FMLA-qualifying leave. The court will therefore grant summary judgment to Defendant on her FMLA claims.

## B. ERISA Claim (Count II)

Plaintiff also argues that her termination and denial of her appeal constituted a violation of ERISA. (ECF No. 25, PageID.1309.) Defendant maintains Plaintiff has proffered no evidence that Defendant took any action for the purpose of interfering with any rights or benefits to which she was entitled. (ECF No. 22, PageID.408.)

Section 510 of ERISA provides, in relevant part,

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.

29 U.S.C. § 1140. In the absence of direct evidence of an ERISA violation, an employee must show "the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employer may become entitled." *Schweitzer v. Teamster Loc. 100*, 413 F.3d 533, 537 (6th Cir. 2005) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). The employer must have acted with "a specific intent to violate ERISA." *Humphreys v. Bellaire Corp.*, 966 F.2d

1037, 1043 (6th Cir. 1992) (quoting *Rush v. United Techs., Otis Elevator Div.*, 930 F.2d

453, 457 (6th Cir.1991)). To this end, the employee must show that interfering with its

rights was at least a "motivating factor" in its decision. *Id.* (citing *Meredith v. Navistar Int'l*

*Transp. Corp.*, 935 F.2d 124, 127 (7th Cir.1991)). If the employee establishes this *prima*

*facie* case, an employer can "rebut the presumption of impermissible action . . . . by

introducing evidence of a legitimate, nondiscriminatory reason for its challenged action."

*Schweitzer*, 413 F.3 at 537 (internal quotations omitted). If the employer successfully

does so, then it is the employee's burden to show the explanation was pretextual. *Id.*

Thus, summary judgment is warranted if Plaintiff fails to either "establish a *prima facie*

case or . . .  to rebut the employer's proffer of a legitimate, nondiscriminatory reason for

its actions." *Id.*

Plaintiff relies in large part on the same facts advanced in her FMLA claims to

establish evidence of Defendant's intent to violate her ERISA rights. (ECF No. 25,

PageID.1310; ECF No. 22-2, PageID.474.) The main thrust of her claim is that she told

Spadine and Eko that she was depressed in their August 19 meeting, and the decision

to fire her was made two days later. (ECF No. 25, PageID.1311.) Additionally, she

argues that her appeal of termination was improperly denied. The temporal proximity to

her termination meets her burden of establishing a *prima facie* case because it

demonstrates "at least some inference of intentional, prohibited activity." *Humphreys*,

966 F.2d at 1044.

However, even if a *prima facie* case can be made, the record firmly establishes

that Defendant had a legitimate, nondiscriminatory reason to terminate Plaintiff's

employment and deny her appeal. For months, beginning in May 2019, Plaintiff missed

work, arrived late, or opted to work from home with little to no notice. Eko met with Plaintiff in early June 2019 after she once again arrived late, and Eko warned Plaintiff that she needed to not only work a forty-hour work week—which Plaintiff failed to do for several weeks—but also "text if she was planning on taking a day off," and emphasized the "need to get 'work from home' approved in advance if she planned on working from home.'" (ECF No. 22-8, PageID.594; ECF No. 22-7.) In short, while Plaintiff's supervisor provided repeated warnings, there is no doubt, nor any contrary inference, that Plaintiff simply did not heed them. In her mid-year performance review in late July 2019, the written report issued to her expressed that she was not meeting particular standards expected of her. (ECF No. 24-17, PageID.1160.) The report continued: "When our team was expected to rally for the team, she isn't completing her own role. *A significant and contributing factor to Haley's decreased performance had been [sic] her attendance.*" (*Id.*, PageID.1160-61 (emphasis added).) Thus, this letter and notation about her poor performance put her on notice that her attendance and tardiness were very concerning issues. And even though the report acknowledges she had a "challenging last [six] months" and had to take several unplanned days off, Plaintiff did not seek to clarify what the reasons for those absences were at her performance review meeting.[7] Her report reiterated that she was "expected to plan [a] vacation in advance and seek approval prior to taking a vacation day. As previously discuss[ed], my expectation is for Haley to put in a full work week—with a minimum of 40 hours per week." (*Id.*) Yet, despite the

---

[7]     Indeed, the reasons for her next three absences, late arrivals, or work-from-home days were wide ranging: she was "not feeling well," she was with her dad who was "having some issues," and she was "getting Ashley's hands wrapped before she goes to nannying." (ECF No. 24-1, PageID.827; ECF No. 22-6, PageID.566.)

explicit need for Plaintiff to improve her attendance and work hours, she immediately

contravened the requirements communicated in the warnings. Her attendance tracker

demonstrates that the very next day after her performance review, she arrived at 10:30

AM and did not work even six hours.[8] At this point, Defendant almost certainly had a

legitimate reason to terminate her; however, its reason to do so became even stronger

in the first two weeks of August.

Plaintiff does not deny that the week of August 5, 2019 was a "critical week for

her role" as the employee responsible for the summer internship program. (ECF No. 22,

PageID.382; ECF No. 25, PageID.1229.) This was the final week of the program, and

the interns' performance in their final presentations impacted whether they would

receive a job offer from Defendant. Of the three biggest days of the program, Plaintiff

was absent for two and arrived after 1:00 PM on the third. (ECF No. 22-10, PageID.602;

ECF No. 22-6, PageID.572-73.) She missed the interns' practice presentations, their

actual presentations, and the program's final day, during which the interns would

publicly display their presentations. As an employee in a department that emphasized

recruitment, outreach, and training functions of Defendant's design operations—and as

an employee who was chiefly responsible for overseeing the internship program—it is

clear her absences during these days were detrimental to the Design Academy.

This led to the attendance letter, issued on August 14.[9] It warned her that she

was "expected to abide by the following attendance and reporting requirements until

---

[8]    Nor did she complete a full forty-hour week for the next two weeks. (ECF No.
ECF No. 22-7, PageID.589-90.)

[9]    To the extent Plaintiff argues this letter was wrongfully issued to her because
Defendant had a policy of allowing sick days or vacation time due to unanticipated

further notice. It must be understood that failure to abide by these requirements may result in your separation from General Motors." (ECF No. 22-13, PageID.615.) She was required to be" in the office, at [her] desk, each morning at [her] start time" of 8:00 AM. (*Id.*) She had to notify Eko or Spadine by 7:00 AM on the day of any absence. (*Id.*) The next two days of work, Plaintiff was late and did not report her late arrivals to anyone, proffering reasons and excuses wholly unrelated to any disability or medical condition. (ECF No. 22, PageID.386; ECF No. 25, PageID.1239.)

Plaintiff's repeated absences and her failure to abide by her signed attendance letter was clearly a legitimate reason to terminate her, and Plaintiff offers no substantive analysis as to whether the reasons for termination constituted a pretext for Defendant's intentional interference with any benefits or rights guaranteed as part of her employment. She appears to rely only on the temporal proximity between Plaintiff's use of the word "depression" in her August 19 meeting and her termination of August 21. But she avoids discussion of her repeated failure to comply with warnings about her attendance or how any of Plaintiff's decisions relate to her benefits as an employee. And in any event, "[e]vidence that the employer had been concerned about a problem before the employee engaged in protected activity undercuts the significance of temporal proximity." *Gilmore v. ITC Holdings Corp.*, No. 11-12641, 2012 WL 6725895,

---

events, her assertion ignores the undisputed evidence that Plaintiff had been talked to multiple times regarding her attendance, particularly about how it was affecting the Design Academy's ability to operate in June and July 2019. (ECF No. 25, PageID.1227; ECF No. 25-2, PageID.1384; ECF No. 24-17, PageID.1160-61; ECF No. 25, PageID.1228.) Moreover, it ignores that the letter was issued in the wake of Plaintiff missing three days that were essential to her position, which she concedes would have been important to the Design Academy. (ECF No. 22-2, PageID.458.)

at *11 (E.D. Mich. Dec. 27, 2012) (Duggan, J.); *accord Sosby v. Miller Brewing Co.*, 415

F. Supp. 2d 809, 822 (S.D. Ohio 2005), *aff'd*, 211 F. App'x 382 (6th Cir. 2006). And this

is precisely why her post-termination appeal was denied. It is clear from the record that

JustUs denied her appeal *solely* due to her tardiness, and there is no evidence that

creates a genuine factual dispute on this point. JustUs representatives made clear that

Plaintiff "chose to be late" and her "depression had nothing to do with her being late"

because she decided to talk to her father on the phone rather than being on time for

work or had other excuses for doing so. (ECF No. 24-18, PageID.1164.) In any event,

Defendant's policies make clear that JustUs judges a decisionmaker's actions *at the*

*time the employment decision was made* and reviews it only to ensure it was done in

accordance with Defendant's own policies. (ECF No. 22-21, PageID.674; ECF No. 24-6,

PageID.998; ECF No. 22-20, PageID.666-67.) Plaintiff presents no evidence that rebuts

this fact or otherwise shows pretext for her termination or failure to reinstate her.

Simply put, the record is replete with evidence to justifying Defendant's decision

to terminate Plaintiff as one that was legitimate, nondiscriminatory, and without an intent

to violate ERISA. No reasonable juror could find otherwise. Thus, the court will grant

summary judgment as to Plaintiff's ERISA claims.

### C. ADA Claims (Count VII) & PWDCRA Claims (Count III)

Plaintiff also brings claims under the ADA and PWDCRA on three different

theories: (1) discrimination, (2) failure to accommodate, and (3) retaliation.[10] Michigan's

PWDCRA "substantially mirrors" the ADA, and claims under both statutes "are generally

---

[10]     In her response, Plaintiff offers no substantive analysis for her retaliation claim.
She addresses only her discrimination and failure to accommodate claims. (ECF No.
25, PageID.1312-24.)

analyzed identically." *See Steward v. New Chrysler*, 415 F. App'x 632, 641 (6th Cir. 2011); *Backhaus v. Gen. Motors LLC*, 54 F. Supp. 3d 741, 748 (E.D. Mich. 2014) (applying the same discrimination and failure to accommodate analysis under both state and federal statute).

### 1. Disability Discrimination

Plaintiff apparently advances her claim of disability discrimination via circumstantial evidence given that she seems to rely on the *McDonnell-Douglas* framework. (ECF No. 25, PageID.1318.). Plaintiff alleges that her termination violated both the ADA and PWDCRA's prohibition of disability discrimination. Courts "apply the *McDonnell-Douglas* burden-shifting test when a plaintiff tries to establish disability discrimination under the ADA and the PWDCRA through circumstantial evidence." *See Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 497 (6th Cir. 2015) (citing *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008). The plaintiff has the initial burden to establish a *prima facie* case and must prove "(1) she has a disability, (2) she was qualified for her position, with or without reasonable accommodation, (3) she suffered an adverse employment decision, (4) her employer knew or had reason to know she had a disability, and (5) her position remained open while her employer sought a replacement." *Messenheimer v. Coastal Pet Prod.*, Inc., 764 F. App'x 517, 518-19 (6th Cir. 2019). Again, if Plaintiff can establish a *prima facie* case, then the burden shifts to Defendant to offer a legitimate, nondiscriminatory reason for the adverse action. *Id.* (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008)). Once Defendant does so, it is Plaintiff's burden to establish by a

preponderance of the evidence that the "proffered reason is merely a pretext for discrimination." *Id.* (citing *Talley*, 542 F.3d at 1105).

Defendant first attacks Plaintiff's ability to make a *prima facie* showing of disability discrimination by arguing that Plaintiff has failed to establish Defendant possessed the requisite knowledge of Plaintiff's disability. The court agrees that Plaintiff has failed to meet its initial burden under the fourth prong. As explained in the court's FMLA analysis, Plaintiff's supervisor directly responsible for Plaintiff's termination, Eko, had no knowledge that Plaintiff had any "disability." Contrary to Plaintiff's contentions, merely stating to Eko that Plaintiff was "having a tough time," "struggling," had a "mental thing," or was suffering from generalized ailments like a headache, fever, or iron-deficiency, without more, does insufficiently little to notify Defendant of a disability. (*See* ECF No. 25, PageID.1219-22; ECF No. 22, PageID.378-80.) An "employer has notice of the employee's disability when the employee tells the employer that he is disabled." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998)). More to the point, "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Id.* (citing *Gantt*, 143 F.3d at 1046-47). Thus, although Plaintiff attempts to argue "[a]ll of the symptomology was there," (ECF No. 25-2, PageID.1372), such that Eko would notice she had a "medical reason" for missing work, "a general awareness of some *symptoms* is not enough to show that [Defendant] . . . knew of [her] *disability*." *Messenheimer*, 764 F. App'x at 519 (emphasis added). Crucially, "[k]nowing that an employee has health problems . . . is not the same as knowing that the employee suffers from a disability" as defined under the ADA. *See*

*Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004) (citing *Hammon*, 165 F.3d at 450); *accord King v. Steward Trumbull Mem'l Hosp., Inc.*, No. 4:19-CV-720, 2021 WL 1578076, at *8 (N.D. Ohio Apr. 22, 2021); *see also* 42 U.S.C. § 12102; 29 C.F.R. § 1630.2(g). Plaintiff fails to establish that Eko, as the "individual decisionmaker responsible for [her] [termination]," had any "knowledge of that disability." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 306 (6th Cir. 2016); (ECF No. 22-4, PageID.512 ("Leaders have the authority to terminate their employees."); ECF No. 22-3, PageID.498.) Simply put, "[a] prima facie case is not made out if the decisionmaker is unaware of the specifics of an employee's disabilities or restrictions, *even if the decisionmaker has a general knowledge that a disability exists*." *Id.* (emphasis added). Here, Eko lacked even a general knowledge of such a disability.

The court need not belabor this point, however, as Defendant undoubtedly had a legitimate, nondiscriminatory reason for firing Plaintiff, and Plaintiff has not met her burden of showing pretext.[11] As more fully explained above, the record is clear that Eko fired Plaintiff for her repeated failures to arrive on time and her evident lack of care for the Design Academy's work. (ECF No. 22-3, PageID.496-98.) Indeed, despite receiving the attendance letter that expressly warned Plaintiff, "[y]our job is in jeopardy," Plaintiff failed to communicate to Eko that her depression was the reason behind her poor performance and instead continued to arrive late of her own accord. (ECF No. 22-13, PageID.615; ECF No. ECF No. 22-7, PageID.589-90.) Plaintiff argues, in passing, that her termination was pretextual because Defendant "knew that her 'depression' had

---

[11]    To the extent she advances this claim on the issuance of the attendance letter or Eko's denial of her transfer request, the analysis is the same.

been diagnosed" when her JustUs appeal was denied, evincing that the "proffered reasons . . . have no basis in fact, did not motivate the adverse action, and were insufficient to justify these."  (ECF No. 25, PageID.1329.) But this statement is largely conclusory and does nothing to address Defendant's reason for firing her. Moreover, as noted in the ERISA analysis, the denial of her post-termination appeal had to do *only* with her failure to abide by the attendance letter and prior absences on crucial working days; no facts create a genuine dispute on this point, especially where JustUs's review is limited to ensuring that the decision *at the time* was proper. (ECF No. 24-18, PageID.1164; ECF No. 22-21, PageID.674; ECF No. 24-6, PageID.998; ECF No. 22-20, PageID.666-67.) Even if JustUs could reinstate Plaintiff, as she contends, JustUs would only do so if it determined Defendant had violated the law or a policy at the time of the termination. Plaintiff points to no evidence that creates a factual dispute on that point, and as explained above, Plaintiff failed to make out a *prima facie* case. Plaintiff presents no evidence that shows pretext for her termination or denial of the post-termination appeal.

### 2. Failure to Accommodate

The basis of Plaintiff's failure to accommodate claim is that Plaintiff, in her August 19 meeting, ostensibly informed Banks and Spadine that she was depressed and, *inter alia*, that she was "trying to find help." (*See* ECF No. 22-2, PageID.461.) Plaintiff maintains that in this meeting, she requested a transfer to the Sculpting Department and that this was a request for a reasonable accommodation, which was ignored.

The Sixth Circuit has recently clarified that claims based on a failure to accommodate are analyzed under a "direct evidence" framework, necessitating an

employee to show: "(1) that he is disabled, and (2) that he is "'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020).

The ADA requires employers to "mak[e] reasonable accommodations." *Fisher*, 951 F.3d at 419 (quoting 42 U.S.C. § 12112(b)(5)(A)). An employee bears the burden of showing that a proposed accommodation is reasonable on its face. *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221 (6th Cir. 2022). "[A]n employee's claim must be dismissed if the employee fails to identify and request such reasonable accommodations." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011). Defendant argues, *inter alia*, that Plaintiff's requested accommodation was not reasonable as a matter of law. (ECF No. 22, PageID.403.) The court agrees, as accommodation requests made in circumstances such as those before the court do not constitute a request for a *reasonable* accommodation.

A transfer to a different department can be a reasonable accommodation under the ADA, as Plaintiff correctly points out. *See, e.g.*, *Coulson v. Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 857-58 (6th Cir. 2002). However, even assuming Plaintiff's request for a transfer was a request for an accommodation for a disability, "it likely came too late to be considered reasonable." *Parsons v. Auto Club Grp.*, 565 F. App'x 446, 449 (6th Cir. 2014). "When an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be 'too little, too late.'" *Id.* (quoting *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78,

90 (1st Cir. 2012). There is an abundance of case law standing for the proposition that "excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA." *See, e.g.*, *Davila v. Qwest Corp.*, 113 F. App'x. 849, 854 (10th Cir. 2004); *Jones*, 696 F.3d at 90 (collecting cases); *Messenheimer v. Coastal Pet Prod., Inc.*, No. 5:17-CV-738, 2018 WL 3609488, at *9 (N.D. Ohio July 27, 2018) (collecting cases), *aff'd*, 764 F. App'x 517 (6th Cir. 2019); *Yoho v. Bank of New York Mellon Corp.*, No. 2:17-CV-917-NR, 2020 WL 7336579, at *4 (W.D. Pa. Dec. 14, 2020) ("Faced with a last-minute request of this kind, an employer has 'no duty to engage in the interactive process' typically required by the ADA, or to provide any 'reasonable accommodation,' even if the employee alleges that the misconduct under investigation was caused by his or her disability."), *aff'd*, No. 21-1071, 2022 WL 296637 (3d Cir. Feb. 1, 2022); *Mishak v. Serazin*, No. 1:17CV1543, 2018 WL 5620091, at *23 (N.D. Ohio Oct. 30, 2018) ("Based on this evidence (and Mishak's failure to request an accommodation at any point prior to the meeting), the Court finds Mishak's last ditch attempt to request an accommodation came 'too little, too late.'"); *cf. Brookins v. Indianapolis Power and Light Co.*, 90 F. Supp. 2d 993, 1007 (S.D. Ind. 2000) (noting, following jury trial finding for employer, that the EEOC recognizes "[s]ince reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability"). Here, "[b]y the time that [Plaintiff] sat down with [Banks and Spadine]," which occurred just days before she was fired, Plaintiff had already been warned multiple times regarding her absenteeism and tardiness, issued an attendance letter that expressly informed her that her job was in

jeopardy, and failed to attend crucial events associated with Defendant's summer internship program as required. *See Parsons*, 565 F. App'x at 449. Termination was imminent, and Plaintiff is not permitted to justify multiple months of terminable conduct by asserting, last minute, that her depression was the reason for her past shortcomings. *See Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012) ("[T]he law does not require the [defendant] to ignore misconduct that has occurred because the [claimant] subsequently asserts it was the result of a disability."); *accord Alvarez v. Sch. Bd. of Broward Cty.*, 208 F. Supp. 3d 1281, 1286 (S.D. Fla. 2016).

Plaintiff, therefore, also cannot advance her ADA claim based on a failure to engage in the interactive process. Although mandatory, the duty is "is only an independent violation of the ADA if the plaintiff establishes a *prima facie* showing that he proposed a reasonable accommodation."[12] *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014); *accord Spagnuolo v. Auto Club Grp. Ins. Co.*, No. 18-CV-13969, 2020 WL 4200977, at *10 (E.D. Mich. July 22, 2020) (Michelson, J.)

---

[12]   Also contributing to the court's finding that Plaintiff's purported accommodation was unreasonable is that, when viewed in context, her August 19 discussion with Banks and Spadine evince that her request was not one related to any disability; rather, she hoped to "force [Defendant] to transfer [her] so that [she] will not be required to work with certain people," which is an *unreasonable* accommodation. *See Coulson*, 31 F. App'x at 858 ("Courts are not meant to act as a super-bureau of Human Resources."); *cf. Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 (6th Cir. 2016) ("[I]n requesting an accommodation, we require plaintiffs not only to request to be accommodated, but to also provide their employers with a sufficient basis to understand that the request is being made because of their disability."). In context, and considering the record as a whole, the true nature of her request is easily viewed as a request for a new supervisor, which is not a reasonable accommodation. *Spagnuolo*, 2020 WL 4200977, at *10; *Coulson*, 31 F. App'x at 858.

### 3. Retaliation

Defendant also moves for summary judgment on Plaintiff's retaliation claims under the ADA and PWDCRA. (ECF No. 22, PageID.405-07.) Despite Defendant's proffer of nearly three pages of analysis on this issue, Plaintiff's response brief makes no mention of her retaliation claims other than in headings or sub-headings. "A plaintiff's failure to address a claim in response to a motion for summary judgment on that claim demonstrates abandonment and waiver of the claim." *Hua v. Home Depot U.S.A., Inc.*, 452 F. Supp. 3d 698, 704 (E.D. Mich. 2020) (Hood, J.) (quotation omitted). Although it appears Plaintiff abandons this claim by ignoring it, the court will briefly address the retaliation theory out of an abundance of caution.

According to Plaintiff's complaint, she alleges the denial of a transfer request, termination, and denial of appeal give rise to her retaliation claim. (ECF No. 20, PageID.261.) From the complaint's allegations, the court discerns that she advances this claim based on circumstantial evidence, using the familiar *McDonnell-Douglas* burden-shifting approach. *Rorrer*, 743 F.3d at 1046. "The plaintiff bears the initial burden to establish a prima facie case of retaliation, which requires a showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Id.* Assuming, *arguendo*, Plaintiff can make out a *prima facie* case—and that much is doubtful—the court once again finds that Defendant has proffered ample evidence of a legitimate, nondiscriminatory purpose for its challenged actions. As more fully outlined in the court's previous burden-shifting analyses, Plaintiff's absenteeism and tardiness was a

known problem for months. Defendant's decisions to deny any transfer to ensure that she could correct her behavior before changing duties, warn her with an attendance letter, and reject her appeal were all inextricably intertwined with Plaintiff's misconduct. There is no evidence to rebut Defendant's proffered reasons, especially where "Plaintiff had been counseled on particular behaviors throughout her employment . . . and little changed." *Cf. Gilmore v. ITC Holdings Corp.*, No. 11-12641, 2012 WL 6725895, at *11 (E.D. Mich. Dec. 27, 2012) (finding lack of causal connection in a retaliation claim under Title VII, ELCRA, and FLSA) (Duggan, J.). Plaintiff cannot argue her termination and post-termination appeal denial were a pretext, as explained above. The court will therefore grant summary judgment as to Plaintiff's ADA claims.

### D. Age Discrimination Under ADEA (Count VIII) & ELCRA (Count V)[13]

Both the ADEA and the ELCRA prohibit firing or otherwise discriminating against employees "because of" their age. 29 U.S.C. § 623(a)(1); Mich. Comp. Laws § 37.2202(1)(a).

> Given this similar language, we have traditionally analyzed ADEA and ELCRA claims using the same causation standard. *See Richardson v. Wal–Mart Stores, Inc.*, 836 F.3d 698, 702 (6th Cir. 2016) (collecting cases). More recently, however, the Supreme Court has clarified that an ADEA plaintiff must demonstrate that his "age was the 'but-for' cause of the challenged adverse employment action." *Id.* at 703 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)). Michigan courts, on the other hand, have held that an ELCRA plaintiff can prove discrimination if his age was merely a "motivating," or "determining factor in the employer's decision." *Town v. Michigan Bell Tel. Co.*, 455 Mich. 688, 568 N.W.2d 64, 68–69 (1997); *see also Meagher v. Wayne State Univ.*, 222 Mich.App. 700, 565 N.W.2d 401, 410 (1997).

> Notwithstanding their different causation standards, a plaintiff may prove age discrimination under both state and federal law using the approach

---

[13]   The court notes, as more fully addressed under its analysis of Title VII and ELCRA claims, that Plaintiff provides *no legal authority* or analysis in support of her age discrimination claims. (ECF No. 25, PageID.1330-31.)

enunciated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.* at 704 (citing *McDonnell Douglas*, 411 U.S. at 792, 93 S.Ct.1817); *see also Town*, 568 N.W.2d at 68-69.

*Lewis v. City of Detroit,* 702 F. App'x 274, 278-79 (6th Cir. 2017); *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 529 (6th Cir. 2014) (noting that even though the burden in an ADEA claim does not shift to an employer "even when a plaintiff has produced some evidence that age was one motivating factor, . . . *McDonnell Douglas* evidentiary framework to prove ADEA claims . . . remains consistent with *Gross*").

Again, the *McDonnell-Douglas* framework allows a plaintiff to establish a claim of discrimination either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination, as Plaintiff apparently does here. *Id.* at 279.

Establishing a circumstantial case for wrongful discharge based on age first requires that Plaintiff present evidence supporting all the elements of prima facie case of age discrimination. *See id.* at 280-81. "To establish a prima facie case of age discrimination under the ADEA, a plaintiff must show that (1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger worker." *George v. Youngstown State Univ.*, 966 F.3d 446, 464 (6th Cir. 2020) (internal quotations omitted); *see also Lewis*, 702 F. App'x at 280. This light burden is "'easily met' and 'not onerous.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020). Similarly, under the parallel Michigan law, "the plaintiff must show that (1) she was a member of a protected class, (2) she was discharged, (3) she was qualified for the position, and (4) she was replaced by a younger person.*" See*

*Winter v. Fitness USA Health Spas Corp.-Flint/Lansing*, No. 188648, 1999 WL

33430030, at *1 (Mich. Ct. App. Nov. 12, 1999) (citing *Matras v. Amoco Oil Co.*, 424

385 N.W.2d 586 (1986)); *Barnell v. Taubman Co, Inc.*, 512 N.W.2d 13, 19 (Mich. Ct.

App. 1993).

"When an employer offers nondiscriminatory reasons for an adverse employment

action, the burden shifts back to the employee to prove that the stated reason for her

termination is pretextual. At this stage, the plaintiff has the burden to produce 'sufficient

evidence from which a jury could reasonably reject [the employer's] explanation of why

it fired her.'" *Blizzard*, 698 F.3d at 285.

Defendant acknowledges that it replaced Plaintiff with a younger employee

approximately three or four months after termination and appears to concede that a

*prima face* case may have been made.[14] (ECF No. 22, PageID.411.) But such a finding

is irrelevant to the ultimate outcome of her claim, as Plaintiff cannot show pretext, and

the court agrees with Defendant that Plaintiff is ultimately unable to meet her burden of

establishing a claim of age discrimination. Plaintiff's attendance letter, termination, and

denial of her appeal had *nothing* to do with her age and *everything* to do with her

attendance. Plaintiff points to nothing other than the fact that her replacement was "a

younger . . . female . . . employee who was in her 20s," who she also notes was

"allowed to transfer back to her former department."[15] (ECF No. 25, PageID.1331.) This

---

[14] Such a conclusion is doubtful, though, where the Sixth Circuit has found that eventual hiring of a younger replacement only three months after termination "substantially weaken[s]" a *prima facie* case on age discrimination. *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 941 (6th Cir. 1987).

[15] To the extent Plaintiff relies on this individual in bringing an ADEA claim for Defendant's failure to grant Plaintiff's many requests for a transfer, her claim fails. Plaintiff has failed to present evidence that the 20 year-old replacement was treated any

comparator does nothing to rebut Defendant's overwhelming evidence of a legitimate, non-discriminatory reason for firing Plaintiff. As noted throughout the opinion, Plaintiff repeatedly ignored warnings about her attendance and late arrivals. As succinctly put in the denial of her appeal:

> [S]ufficient evidence indicated that you had been made aware on multiple occasions that . . .  your troublesome behavior concerning attendance, was an issue. Exhibited was the information documented in your 2019 Mid-Year CAP, as well as communications to you in a letter placed in your personal file. This letter directly stated that your attendance must improve immediately; that your job was in jeopardy. Further, failure to comply with these expectations would result in further discipline, up to and including termination. Evidence then indicated that you chose not to heed this unambiguous warning.

(ECF No. 22-23, PageID.682.) The record firmly corroborates these reasons. As to pretext, "Plaintiff has offered no other evidence that age was a determining factor for [her] discharge. Plaintiff's replacement by a younger employee, without more, is insufficient to support a claim of age discrimination." *Barnell*, 512 N.W.2d at 19 (citing *Eliel v. Sears, Roebuck & Co.*, 387 N.W.2d 842 (1985)); *Tennial*, 840 F.3d at 305-06 ("Although Tennial was able to establish a *prima facie* case of age discrimination . . . the sole fact that he was replaced by a younger person is insufficient as a matter of law to raise a genuine dispute of material fact as to whether UPS's nondiscriminatory reason for demoting him was pretextual."). Plaintiff's rebuttal casts no doubt on

---

differently. Plaintiff alleges in her response, citing Eko's deposition, that the younger employee was permitted to "transfer back to her former department for personal reasons." (ECF No. 25, PageID.1296; ECF No. 24-4, PageID.973.) But, as far as the court can tell, that is not true. Eko's deposition makes no mention of this employee ever transferring out of the department to another at her request. Rather, it establishes that her replacement "went on leave of absence" twice, as she was a "new mother" and was "taking care of family members." (ECF No. 24-4, PageID.973.) This is the only evidence Plaintiff cites in support of her proposition.

Defendant's proffered legitimate reasons. Thus, since "plaintiff has not rebutted defendant's legitimate, nondiscriminatory reason for discharge," Plaintiff's age discrimination claims fail. *Barnell*, 512 N.W.2d at 19. Summary judgment is warranted for Defendant.

### E. Race & Sex Discrimination Under Title VII & ELCRA (Counts IV, VI, IX, X)

Title VII provides that it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" race or sex. 42 U.S.C. § 2000e–2(a)(1). Similarly, Michigan's ELCRA prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of" race or sex. Mich. Comp. Laws § 37.2202(1)(a). While a party may establish a violation either through or direct or circumstantial evidence, Plaintiff apparently brings this claim based on circumstantial evidence. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). "Where, as here, the claim is based on circumstantial evidence, we employ the burden-shifting framework set forth in *McDonnell Douglas*." *Id.* (addressing race discrimination claims under Title VII). The *prima facie* requirements for a discrimination case are the same under Michigan law and federal law. *Id.* (citing *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 193 (Mich. 2003) (applying the federal burden-shifting approach to a sex discrimination claim under ELCRA).

"To establish a prima facie case of discrimination under both Title VII and the [ELCRA], Plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and

performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class." *Id.* at 727. If the plaintiff makes out the *prima facie* case, the "burden of production of evidence shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions." *Id.* If the defendant does so, then the burden shifts back to the plaintiff to show the proffered reason was a pretext. *Id.* "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." *Id.* (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)).

Defendant moves for summary judgment on all claims under Title VII and ELCRA, arguing that Plaintiff has not identified a "'similarly situated' employee nor a circumstance that suggests that her sex, age or race were a motivating factor in her termination." (ECF No. 22, PageID.408.) Defendant avers that Plaintiff's inability to meet her burden on her "gender, race, and age claims under both the state and federal law" applies to all employment actions that [she] identified as adverse in her Amended Complaint . . ., some of which are not legally cognizable adverse employment actions." (*Id.*)

Notably, Plaintiff offers no legal analysis as to these claims; there is an absence of citation to any legal authority other than, at the end of a list of factual assertions with no citation to the record, two cases that address only claims under the ADA and not Title VII or ELCRA. (ECF No. 22, PageID.1331.) Plaintiff states simply that "[t]he evidence upon which [she] . . . relies to support her ADA, ERISA, FMLA, and PWDCRA claims discloses that Plaintiff has established prima facie cases of disparate treatment

discrimination against her on account of age, race, and sex." (ECF No. 25, PageID.1330.) However, she does not address Defendant's fully-analyzed "similarly situated" arguments, nor does Plaintiff address Defendant's statement regarding claims that are not cognizable. "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . .  put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997); *see also Edwards v. Comm'r of Soc. Sec.*, No. CV 17-13265, 2018 WL 3319128, at *3 (E.D. Mich. June 19, 2018) (Grand, M.J.) *report and recommendation adopted*, No. 17-13265, 2018 WL 3304684 (E.D. Mich. July 5, 2018) (noting that a court need not "supply any and all legal authority to salvage [a party's] arguments" where it cites no legal authority). The court will proceed to analyze Defendant's motion based on the legal authority advanced. *See Scozzari v. City of Clare*, 723 F. Supp. 2d 945, 974 (E.D. Mich. 2010) (Ludington), *aff'd sub nom.*, 454 F. App'x 455 (6th Cir. 2012).

To be deemed "similarly-situated" under the discrimination framework, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). "Although other factors may also be relevant, depending on the facts of each case, the *Mitchell* factors are generally relevant." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019). The court finds them to be of particular importance here. Notably, the "same supervisor" factor is an

"inflexible requirement," and does not require a showing that the comparator was subject to the *immediate* supervisor; it could include someone involved in the general decision-making process. *Id.*; *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005). Defendant maintains that Eko is the critical supervisor in this analysis, although the court could find that the standard could encompass Banks and Spadine as well. Plaintiff offers no opposition to Defendant's contention. Notwithstanding this potential discrepancy, the court agrees with Defendant that Plaintiff has failed to establish any "similarly-situated" employees because the circumstances surrounding the treatment of these employees is wholly absent from the record.

Defendant maintains that Plaintiff, who is white, cannot produce any crucial information behind any employee's allegedly more favorable treatment. It argues this is particularly true because there is no evidence as to "who the decision-maker was or what the underlying circumstances were." (ECF No. 22, PageID.410.)

Regarding her race discrimination claim, Plaintiff's deposition testimony explains that she advances her claim of race discrimination based on an African-American who, according to her, was subjected to more favorable treatment when he was having job performance issues. (ECF No. 22-2, PageID.468.) Plaintiff explains that he was put on a "performance improvement plan" and "it seemed like more effort was put into that situation than into my situation." (*Id.*) She could give no more specific information. Plaintiff provides no evidence of when this individual was put on an improvement plan, and she admitted that she did not know who was involved in the decision to do so. (*Id.*, PageID.469.) She further admitted she did not have any knowledge of "the specific

circumstances which led to" the individual being put on a performance improvement plan, such as whether he had issues with absenteeism or tardiness. (*Id.*)

Similarly, in support of her sex discrimination claim, Plaintiff identifies multiple male employees in, varying departments, who either were placed on a performance improvement plan or had a "greater length of time that they were working with their managers than [her]." (*Id.*) Plaintiff could not identify their supervisors responsible for working with them through their "performance issues"—notably, these individuals never dealt with Eko, Banks, Spadine, or anyone that Plaintiff ever dealt with when she began engaging in terminable conduct. (*Id.*) Nor could Plaintiff identify any circumstances behind the identified individuals' performance issues, such as why they were put on a performance improvement plan, and did not know "what the decision-making process was" that resulted in their improvement plans. (*Id.*)

Putting aside Plaintiff's clear failure to establish comparators for either her race or discrimination claims, Plaintiff's claims, yet again, fail for the inability to establish pretext. There is absolutely no evidence that Plaintiff's sex or race had anything to do with any adverse employment action taken against her.[16] Despite Eko's emphasizing of

---

[16]     Insofar as Plaintiff argues that Defendant's failure to transfer her is the basis of this claim, it appears she relies on the fact that "Defendant continued to hire candidates for and transfer employees to Sculpting positions for which Plaintiff had been qualified between Spring, 2018, and November 25, 2019, including candidates and employees who were younger than Plaintiff, male, and non-Caucasian." (ECF No. 25, PageID.1331.) But nothing in the record that Plaintiff cites to shows that there were individuals *transferred* to the Sculpting Department. Plaintiff, at one point in her response, cites to Defendant's interrogatories to establish this. (ECF No. 24-10, PageID.1068.) Yet, the interrogatory admits employees had been "hired," but not necessarily "transferred." (*Id.*) And even if they were, there is no evidence of the *circumstances* behind their transfer, such as who approved the decisions or why, ultimately dooming Plaintiff's showing that these individuals were "similarly-situated."

the necessity to work a full forty-hour week and inform her in advance of any absences, Plaintiff ignored Eko's concerns and subsequently flouted an attendance letter that warned her that her failure to abide by its terms could result in her firing. Plaintiff does not advance any evidence to show that the proposed reasons for adverse employment action taken against her was a pretext based on her sex or race. (ECF No. 22-13, PageID.615; ECF No. ECF No. 22-7, PageID.589-90.) "Pretext is a common-sense inquiry: did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400, n.4 (6th Cir. 2009). Commonsense demands the conclusion that the reasons proffered here were the true reasons for her termination. The court accordingly will grant summary judgment on all Title VII and ELCRA claims.

## IV. CONCLUSION

For the reasons stated above, the court will grant Defendant's motion for summary judgment on all claims alleged in Plaintiff's complaint. Viewing the record as a whole, Plaintiff has failed to meet her burden of identifying specific facts showing that there is a genuine issue for trial. Accordingly,

IT IS ORDERED that Defendant General Motors' Motion for Summary Judgment (ECF No. 22) is GRANTED. A separate judgment will issue.

s/Robert H. Cleland                    /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 31, 2022

---

otherwise gives no reason or circumstances behind this individual's transfer. ECF No. 25-2, PageID.1341-42.) No evidence supports the assertions in her response.

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 31, 2022, by electronic and/or ordinary mail.

s/Lisa Wagner                          /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\20-11015.HRDLICKA.MotionForSummaryJudgment.MAZ.3.RHC.2.docx